Regina KOENIG (SSN: 512–50–9507), Plaintiff,

v.

Shirley S. CHATER, Commissioner, Social Security, Defendant.

Civil Action No. 95–2467–KHV.

United States District Court, D. Kansas.

July 31, 1996.

Joan H. Deans, J.H. Deans Law Office, Raytown, MO, for plaintiff.

Christina L. Medeiros, Office of United States Attorney, Kansas City, KS, for defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

This action comes before the Court on plaintiff Regina Koenig's *Motion For Judgment* (Doc. # 9) filed February 27, 1996. Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of the Commissioner denying her claim for disability benefits under Title XVI of the Social Security Act. For the reasons set forth below, the case is remanded to the Commissioner for additional fact findings regarding plaintiff's sleep complaints.

## PROCEDURAL HISTORY

Plaintiff applied for disability benefits on August 25, 1992, alleging that she was unable to work as of April 4, 1991, because of foot problems. (Tr. 33–45). Plaintiff's claim was denied initially and on reconsideration. (Tr. 47–50, 63–65). On October 27, 1994, an Administrative Law Judge (ALJ) held an administrative hearing at plaintiff's request. (Tr. 179–230). The ALJ entered a decision on November 10, 1994, finding that plaintiff was not disabled under the Social Security Act. (Tr. 8–18). On September 1, 1995, after consideration of additional medical evidence (Tr. 2), the Appeals Council denied plaintiff's request for review. (Tr. 3–4). Thus the ALJ's decision stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481 (1995).

## FACTUAL BACKGROUND

Plaintiff, Regina Koenig, is 43 years old. She has a high school education and past relevant work experience as a head waitress, house cleaner, and counter attendant. (Tr. 73). She alleges that she has been disabled since April 4, 1991, due to problems with her feet. (Tr. 33–45). Plaintiff has not engaged in substantial gainful activity since April 4, 1991, the alleged onset date of her disability.

In October 1986, plaintiff sought treatment from Dr. Jerry S. Jackson, a podiatrist. Dr. Jackson noted multiple deformities of both feet, worse on the left. He diagnosed enlargement of metatarsals 1, 3 and 5; hallux abducto valgus deformity; and contracture of digits 2, 3, and 4 on the left foot. (Tr. 150). On November 7, 1986, Dr. Jackson operated on plaintiff's left foot, performing a bunionectomy on the first metatarsal phalangeal joint, v-osteotomy on the third metatarsal, arthroplasty on the fifth metatarsal, and subcutaneous flexor tenotomies on digits 2, 3, and 4. (Tr. 150–151). Plaintiff did well post-operatively and made good progress. (Tr. 154).

Office notes from September 1987, show that plaintiff returned to Dr. Jackson complaining of pain in her right foot. (Tr. 154). Dr. Jackson advised plaintiff to restrict her activity and wear appropriate shoes. He also noted that the left foot was "doing fine." (Tr. 154). In May 1991, plaintiff returned to Dr. Jackson with complaints of chronic foot problems. Dr. Jackson debrided the feet and prescribed a topical medication. (Tr. 154). He advised plaintiff of the need for periodic professional debridement or medication. (Tr. 154).

On August 12, 1992, plaintiff complained of left foot pain to Dr. William B. McCollum, her treating physician. (Tr. 88). She described intermittent swelling of her left foot which had become progressively worse with shooting pain in the past month. (Tr. 88). Office notes indicate that Dr. McCollum thought plaintiff might have a nerve impingement as well as some osteoarthritic changes. He had no "big suggestions" and recommended heat, and elevation and prescribed Darvocet. (Tr. 88). Plaintiff returned to Dr. McCollum on August 26 and September 2, complaining of left foot pain and limp, as well as back pain. Dr. McCollum referred her to Dr. Gary D. Boston, an orthopedist. (Tr. 88). Dr. Boston examined plaintiff on September 11, 1992. He diagnosed plantar keratoma and bunion of the left foot and recommended activity as tolerated. (Tr. 90–91).

On February 22, 1993, plaintiff saw Dr. Gael R. Frank for evaluation of residuals of left foot surgery. (Tr. 97–98). Plaintiff indi-

cated that she was developing pain in her right foot and that occasionally the pain in her left foot radiated up to her back. Dr. Frank noted that plaintiff ambulated with an antalgic gait on the left and had some weakness of the plantar flexors of the left foot and ankle when attempting to walk on her toes. (Tr. 97). A neurological examination revealed that plaintiff had no sensory deficit though she claimed that her left foot occasionally went numb. (Tr. 97). Examination of the back showed no thoracolumbar deformity. Dr. Frank also noted that plaintiff had normal range of motion of the left foot and ankle. (Tr. 98). The diagnosis was status post-op multiple foot surgeries, exact procedures unknown; plantar callus, left foot; and possible plantar wart over third metatarsal head. (Tr. 98). Regarding plaintiff's ability to do work, Dr. Frank concluded that plaintiff could sit one hour at a time and seven hours daily; stand one hour at a time and five hours daily, walk six blocks; and lift/carry 20 pounds. (Tr. 98).

In February 1994, plaintiff received treatment at St. Luke's Hospital. (Tr. 123). She complained of pain in her feet and right hip as well as insomnia. Her doctor diagnosed probable fibromyalgia and prescribed Elavil. (Tr. 123).[1] In March 1994, it was noted that plaintiff's feet continued to be tender to touch, but less so than before. (Tr. 120). The assessment was "fibromyalgia with excellent response to Amitriptyline." (Tr. 120).

On May 6, 1994, plaintiff returned again to St. Luke's. She continued to describe burning in her feet with pain shooting up both legs and localizing in the small of her back. (Tr. 119). She reported that she could not walk without lower extremity pain and was having sleepless nights. (Tr. 119). Examination revealed that deep tendon reflexes in the right leg were slightly less than in her left and that she had point tenderness in her sacroiliac joints. It was noted that she was no longer getting significant pain relief on Elavil, therefore Tylenol # 3 was prescribed. (Tr. 119). X-rays of the lumbosacral spine on May 9 showed "slight degenerative change with narrowing of the L5–S1 disc interspace, with less at L4–5." (Tr. 140). The sacroiliac joints showed no fracture or erosion and were relatively symmetrical. (Tr. 140).

In June 1994, plaintiff was referred to the Rheumatology Clinic at St. Luke's Hospital. (Tr. 159). She described a constant dull pain in her legs, as well as a sharp pain that traveled from her feet to her shoulders. (Tr. 159). Physical examination revealed that she was tender to palpitation all over her body, although she appeared to experience increased pain at trigger points and on the soles of her feet. (Tr. 159). The attending physician diagnosed probable fibromyalgia and prescribed Flexeril because Elavil was not working. (Tr. 159). Plaintiff was also advised to participate in water aerobics and to decrease her sedentary activity. (Tr. 159). A subsequent staff note following this evaluation reported that plaintiff's symptoms were exacerbated by social considerations such as applying for disability, and that her social situation made it less likely that she would respond to treatment. (Tr. 158). On August 8, 1994, plaintiff underwent a CT scan of the lumbar spine in response to her complaint of right hip and leg pain. (Tr. 169). The scan revealed no evidence of a disk herniation or significant spinal stenosis. The physician's report concluded that there was "no clear anatomic correlate with the reported pain." (Tr. 169).

During her administrative hearing on October 27, 1994, plaintiff testified that she experiences sharp and constant pain in her back, hips, knees, calves, ankles, and feet. (Tr. 188–189). Plaintiff stated she was currently taking Flexeril and Tylenol # 3. (Tr. 184). She said that her doctors had advised her to do water aerobics as well as much walking as she could tolerate. (Tr. 190–191).

Plaintiff testified that she had good days and bad days. (Tr. 185). She stated that on a bad day she would stay in bed with a heating pad and only get up to use the bathroom. (Tr. 203). Plaintiff testified that three out of four weeks in the month were

---

1. Fibromyalgia is pain in the fibrous tissues, muscles, tendons, ligaments, and other white connective tissues, frequently affecting the low back, neck, shoulders, and thighs. *See The Merck Manual* (16th ed. 1992), pp. 1369–70.

usually bad days. (Tr. 185). Plaintiff stated that she could sleep only about 1–2 hours every night because of the pain. (Tr. 206). She said that she dozes off and on during the day, and her ability to function is impaired by her lack of sleep. (Tr. 206). When asked if she had any mental or emotional problems, plaintiff said that she was not sure, but stated that she sometimes felt depressed. (Tr. 197).

Regarding her functional capacity, plaintiff testified that she can climb stairs and kneel with difficulty, walk no more than 6 to 8 blocks, lift approximately 8 pounds, bend on good days, stand for no more than 30–40 minutes, and sit for no more than 10–15 minutes. (Tr. 191–193).

In describing her daily activities, plaintiff testified that she does the cooking, some laundry, and other light housekeeping chores. (Tr. 193–194). Plaintiff also stated that she visits friends, visits and cooks out in her backyard, occasionally goes shopping, and watches her daughter bowl. (Tr. 195–196, 199). Plaintiff testified that after going with a friend on a "big outing" which typically lasts from two to two and a half hours she would be totally exhausted. (Tr. 207). She stated that she seldom drives a car. (Tr. 186). Plaintiff testified that she does simple stretching exercises at home everyday. (190–191). She also testified that she did water aerobics at a friend's pool every day from May to September of 1994. (Tr. 205–206).

Lynn I. DeMarco, M.D., a specialist in internal medicine and allergy, immunology and rheumatology was retained by the Commissioner to testify as a medical expert. (Tr. 208–24). Dr. DeMarco reviewed the evidence and heard plaintiff's testimony. He testified that plaintiff had fibromyalgia, a soft tissue rheumatic disorder which causes complaints of musculoskeletal aches and pains and fatigue. (Tr. 209, 216). He stated that plaintiff also had had left foot bunion surgery with related intermittent problems since then. (Tr. 211).

Dr. DeMarco testified that traditional treatment for a person with fibromyalgia consisted of an increase in physical activity and participation in a strenuous exercise program. (Tr. 212). He stated that the more a person becomes conditioned, the less pain he or she has. (Tr. 214). Dr. DeMarco said that sedentary behavior and lying down only serve to aggravate the disorder. (Tr. 212). He also testified that fibromyalgic pain is not incapacitating pain. (Tr. 216).

Dr. DeMarco stated that plaintiff's complaints of sleeplessness were not symptoms of fibromyalgia. (Tr. 216, 219). He noted that fibromyalgia resulted in nonrestorative sleep rather than total sleep deprivation. (Tr. 218–219). He testified that such nonrestorative sleep could be successfully treated by Amitriptyline and noted that the medical record showed that plaintiff had been on such medication in the past with success. (Tr. 222). He concluded that plaintiff's sleeplessness was probably related to the fact that she was laying down too much during the day and not to fibromyalgia. (Tr. 220).

Finally, Dr. DeMarco testified that plaintiff should have no restriction with her ability to sit, walk, bend, and grip; should be able to stand for 1–2 hours at a time, and 6–8 hours in an eight hour period; and should be able to lift 20 pounds frequently. (Tr. 213–214).

Vocational expert, Ronald Frederickson, also testified at the hearing. The ALJ posed a hypothetical question in which he asked the expert to assume an individual of plaintiff's age, education, past relevant work, and a residual functional capacity (RFC) as described by Dr. DeMarco. (Tr. 226–227). In his hypothetical, the ALJ further stated that if such a person pushed herself and exercised she would not have any form of disabling pain, and had not experienced disabling pain in the past two years. (Tr. 227–228). The vocational expert responded that, based on the ALJ's assumptions, plaintiff could perform jobs as a security monitor, information clerk, meter reader, and cashier. (Tr. 228–230). He testified that in Kansas there are roughly 1,500 jobs as security monitor; 500 as information clerk; 400 as meter reader; and 3,000–4,000 jobs as cashier. (Tr. 228–230). Nationwide, he testified, there exist approximately 50,000 jobs as security moni-

tor, 18,000 as information clerk, and 15,000 as meter reader. (Tr. 228–229).

## ALJ's DECISION

In his order of November 10, 1994, the ALJ made the following findings:

1. Claimant has not engaged in substantial gainful activity at any time since April 4, 1991.

2. The medical evidence establishes that claimant has fibromyalgia; is status post left bunion surgery; and has minimal degenerative changes in the lumbar spine and left foot, but she does not have an impairment or combination of impairments listed in, or medical [sic] equal to one listed in Appendix 1, Subpart P, Regulations No. 16.

3. Claimant's testimony as to the severity of her impairments and attending symptoms is found to be less than fully credible for the reasons set forth in the Rationale section of this decision.

4. Claimant retains the residual functional capacity for a range of light work with the particular restrictions set forth hypothetically at the time of her hearing.

5. Claimant is incapable of performing any of her past relevant work.

6. Claimant has ranged between 39 and 42 years of age.

7. Claimant is a "high school" graduate.

8. Claimant acquired skills in her past relevant work and such skills are transferable to the skilled or semi-skilled functions of other work.

9. Based on an exertional capacity for a range of light work, and claimant's age, education and work experience, Section 416.969 and the framework of Rule 202.22, Table No. 2, Appendix 2, Subpart P, Regulations No. 16 indicates that a conclusion of not disabled is appropriate.

10. Although claimant has some non-exertional pain, using the above cited rule as a framework for decisionmaking, there are a significant number of jobs in the economy which she can nonetheless perform, the numbers and identities of which were specifically set forth by the vocational expert at the time of her hearing.

11. Claimant has not been under a "disability" as defined in the Social Security Act, as amended, at any time through the date of this decision.

(Tr. 11–18).

## STANDARD OF REVIEW

The Court's standard of review is set forth at 42 U.S.C. § 405(g), which provides that "the finding of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." The Court's review also extends to determining whether the Secretary applied the correct legal standards. *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir.1994). Substantial evidence is more than a scintilla and is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401–02, 91 S.Ct. 1420, 1427–28, 28 L.Ed.2d 842 (1971); *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir.1989). A finding of no substantial evidence will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence. *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir.1992) (quotations and citations omitted). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir.1994) (citation omitted). The Court's duty is not to reweigh the evidence, however, or substitute its decision for that of the ALJ. *See Hamilton v. Secretary of Health and Human Servs.*, 961 F.2d 1495, 1500 (10th Cir.1992); *Fowler v. Bowen*, 876 F.2d 1451, 1453 (10th Cir.1989); *Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir.1991).

## DISCUSSION

Plaintiff has the burden of proving disability under the Social Security Act. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). "Disability" is defined in the Act as the inability to engage in any substantial gainful activity for at least twelve months due to a medically determinable impairment. 42 U.S.C.A. § 423(d)(1)(A) (1995).

The Act states:

An individual shall be determined to be under a disability only if his physical im-

pairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C.A. § 423(d)(2)(A).

■ To determine whether a claimant is under a disability, the Commissioner applies a five-step sequential evaluation: (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) whether the impairment prevents the claimant from continuing his past relevant work and (5) whether the impairment prevents the claimant from doing any kind of work. *See* 20 C.F.R. §§ 404.1520, 416.920 (1994). Once the claimant proves that her disability prevents her from engaging in her prior work for a continuous period of twelve months (Steps 1–4), the burden then shifts at the fifth step to the Commissioner to show that the claimant possesses the RFC to perform other work that exists in the national economy. *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir.1993). Here, the ALJ denied benefits at step five of the sequential evaluation process. He stated that plaintiff did not possess the ability to return to her former work but concluded that she possessed the RFC to perform the jobs of security monitor, information clerk, meter reader, and cashier. Therefore the ALJ found plaintiff not "disabled" within the meaning of the Social Security Act. (Tr. 17).

Plaintiff argues that the ALJ made several errors in deciding her claim and that the Secretary's decision is not supported by substantial evidence.

■ First, plaintiff claims that the ALJ relied unduly on the testimony of Dr. DeMarco in finding that she was not disabled by fibromyalgia. While it is true that the reports of a reviewing physician (one who does not examine the claimant and who merely reviews the medical record) are accorded lesser weight than the opinions of treating physicians, *Talbot v. Heckler,* 814 F.2d 1456, 1463 (10th Cir.1987), the Court finds that the ALJ did not rely solely on Dr. DeMarco's opinion or reject the medical opinion of other physicians in making his findings.

As the ALJ notes, Dr. DeMarco's testimony is consistent with the reports of plaintiff's physicians. There is no indication in the record that any of plaintiff's physicians diagnosed plaintiff as being disabled due to fibromyalgia. *Cf. Preston v. Secretary of Health & Human Servs.,* 854 F.2d 815, 819 (6th Cir.1988); *See Frizzell v. Shalala,* 37 F.3d 1509, 1994 WL 562026, (10th Cir.1994) (affirming district court's finding of "not disabled" where plaintiff had fibromyalgia and no doctor said the condition was disabling). In fact, as the ALJ states in his decision, the record reveals that both treating and examining physicians have expressed opinions that claimant is not disabled. After a thorough evaluation, orthopedic specialist Dr. Frank concluded that plaintiff could sit one hour at a time and seven hours daily; stand one hour at a time and five hours daily, walk six blocks; lift/carry 20 pounds; and that her other activities were not at all affected. The ALJ noted that this assessment is inconsistent with disability and is closely analogous to the definition of light work as that term is defined in 20 C.F.R. § 404.1567. Furthermore in June 1994, the attending physician at St. Luke's Hospital specifically advised plaintiff to decrease her sedentary activities and to participate in water aerobics. In light of the consistency between Dr. DeMarco's testimony and the reports of plaintiff's physicians, the Court rejects plaintiff's argument that the ALJ unduly relied on Dr. DeMarco's testimony.

■ Next, plaintiff argues that the ALJ did not apply the proper standard for evalu-

ating her complaints of pain. Specifically, plaintiff argues that her pain is disabling and that the ALJ may not reject her subjective testimony merely because the complaints are not fully corroborated by objective medical evidence.

 A diagnosis of fibromyalgia does not automatically mean that a claim of disabling pain must be accepted. *See Tsarelka v. Secretary of Health & Human Servs.*, 842 F.2d 529, 534 (1st Cir.1988) (The mere presence of a fibrositis condition does not entitle [plaintiff] to disability benefits."). In this circuit, the framework for analyzing evidence of disabling pain was laid out in *Luna v. Bowen*, 834 F.2d 161 (10th Cir.1987). In sum, the Court considers: (1) whether the claimant proves with objective medical evidence an impairment that causes pain; (2) if so, whether a loose nexus exists between the impairment and the subjective complaints of pain; and (3) if so, whether the pain is disabling based upon all objective and subjective evidence. *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir.1994). In the final step, the ALJ is to consider several factors in making his determination, including:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgement of the ALJ, the motivation of an relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir.1988).

██ In his credibility analysis, the ALJ relied on several of the factors listed above. (Tr. 13). Though the written decision could have discussed these factors in greater detail, failure to do so is not legal error in itself. *See Porter v. Chater*, 895 F.Supp. 1427, 1436 (D.Kan.1995). In his decision, the ALJ noted that plaintiff's wide range of daily activities were inconsistent with her testimony of disabling pain. The ALJ also noted that plaintiff had "not had any significant adverse side effects from her drugs nor does she allege

any." (Tr. 15). He further considered the demeanor of plaintiff during trial, noting that "claimant entered the hearing room, sat and stood without problem.... She was appropriately responsive to questioning and showed no signs of distress." (Tr. 13). The lack of objective medical evidence also factored in to the ALJ's credibility determination. Finally, the ALJ considered the staff note by plaintiff's treating physician at St. Luke's stating that plaintiff's symptoms were exacerbated by her social considerations, *i.e.* her application for disability benefits. (Tr. 14).

 In reviewing the ALJ's credibility determinations, the Court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." *Casias v. Secretary of Health and Human Servs.*, 933 F.2d 799, 801 (10th Cir.1991). "Credibility is the province of the ALJ." *Hamilton v. Secretary of Health & Human Servs.*, 961 F.2d 1495, 1499 (10th Cir.1992). In this case, the ALJ's credibility determinations are borne out by the record. In addition to the factors pointed out by the ALJ, the Court also notes that there were serious discrepancies in plaintiff's testimony. At one point during the hearing, plaintiff testified that she did stretching exercises every day. Later in the hearing she testified that three out of four weeks were bad days in which she did not get out of bed except to use the bathroom. Shortly after that statement she testified that she had been doing water aerobics at a friend's pool every day for four months. "Subjective complaints of pain may be discounted if there are inconsistencies in the evidence as a whole." *Box v. Shalala*, 52 F.3d 168, 171 (8th Cir. 1995) (quoting *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984)). We therefore reject plaintiff's challenge to the finding concerning her subjective complaints of pain.

 Plaintiff also argues that the ALJ erred by failing to consider whether plaintiff's physical pain had a psychological origin. There is no indication in either physician reports or plaintiff's applications for benefits that plaintiff's physical problems stemmed from a psychological impairment. The only

mention of psychological impairment in the record took place during the hearing, when plaintiff testified that she sometimes felt depressed. The Court finds that this statement, standing alone, does not amount to substantial evidence that the ALJ erred in finding no psychological basis to plaintiff's complaints of pain.

Finally, plaintiff contends that the vocational expert testimony was based on a faulty hypothetical question. Specifically, plaintiff points to the ALJ's hypothetical that if plaintiff's condition were properly treated, she would take a form of Amitriptyline which would help her sleep at night and decrease her fatigue. Plaintiff asserts that the hypothetical fails to take into account that she had been taking Amitriptyline or Elavil and still experienced sleep problems. Thus, she contends that the ALJ erred by not having the vocational expert consider plaintiff's lack of sleep as a factor in formulating the RFC.

In formulating his hypothetical question the ALJ need not include alleged limitations that he does not accept as true. *See Roberts v. Heckler,* 783 F.2d 110, 112 (8th Cir.1985). If the hypothetical question included those impairments the ALJ found credible and excluded those he discredited for legally sufficient reasons, the Commissioner's burden to show a significant number of jobs in the national economy that plaintiff could perform is satisfied by the vocational expert's testimony. *Gay v. Sullivan,* 986 F.2d 1336, 1340–41 (10th Cir.1993). The ALJ's hypothetical reflects that he implicitly rejected any claim that plaintiff experienced a *bona fide* sleep problem that materially affected her ability to work. Though his conclusion may be borne out by the medical evidence in the record, the ALJ made no express finding on this issue. It is inappropriate for this Court to affirm on grounds other than those expressly stated by the ALJ. *Gray v. Shalala* 34 F.3d 1076, 1994 WL 413232 (10th Cir.1994) (citations omitted) (reviewing body is not to fill in gaps in ALJ's decision). In light of the ALJ's failure to make the necessary findings, the proper course for the Court is to remand this portion of the case to the ALJ for an adequate explanation of his decision regarding plain-

tiff's sleep complaints. *See Gray v. Shalala,* 34 F.3d 1076, 1994 WL 413232 (10th Cir. 1994); *Baerga v. Richardson,* 500 F.2d 309 (3rd Cir.1974) (judiciary must hold administrative officers to high standards in the discharge of fact-finding functions).

**IT IS THEREFORE ORDERED** that plaintiff's *Motion For Judgment* (Doc. # 9) filed February 27, 1996, be and hereby is denied in part and sustained in part. The Commissioner's decision denying plaintiff's application for benefits is remanded to the Commissioner for further proceedings consistent with this opinion and order.